UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LEE ANN GASPAR, RICHARD
HETHERINGTON, and DAVID WINCH,

    Plaintiffs,

v.

Case No. 08-cv-13707

Honorable Patrick J. Duggan

DAVID DICKS, individually and in his
official capacity as Chief of Police of the
Flint Police Department, and the CITY OF
FLINT,

    Defendants.
_____/

## OPINION AND ORDER

At a session of said Court, held in the U.S.
District Courthouse, Eastern District
of Michigan, on_December 29, 2010.

PRESENT:    THE HONORABLE PATRICK J. DUGGAN
                   U.S. DISTRICT COURT JUDGE

Lee Ann Gaspar, Richard Hetherington, and David Winch ("Plaintiffs") filed this action against the City of Flint ("City") and David Dicks, the City's acting police chief, alleging that the City's policy prohibiting police officers from communicating with the media violates the First Amendment to the United States Constitution. Plaintiffs further allege that discipline imposed on Hetherington and Winch violated their First Amendment rights and Fourteenth Amendment due process rights. Before the Court is Defendants' Motion for Summary Judgment, filed pursuant to Federal Rule of Civil Procedure 56. The matter has been fully briefed, and the Court heard oral arguments on November 30, 2010.

For the reasons stated below, the Court grants Defendants' Motion in part and denies it in part.

## I. Factual and Procedural Background

At all times relevant, Richard Hetherington was employed as a sergeant by the Flint Police Department ("Department"), and was president of the union representing the Department's sergeants. Compl. ¶ 3. David Winch was a Department lieutenant and president of the union representing the Department's lieutenants and captains. *Id.* ¶ 4. Lee Ann Gaspar was a sergeant and served as a steward for the union representing the Department's sergeants.[1] *Id.* ¶ 2.

In June 2008, the City's Mayor, Donald Williamson, appointed David Dicks to the position of acting police chief. *Id.* ¶ 9. The appointment was controversial because Dicks, a former Flint police officer, lacked supervisory experience and had been terminated from the police force after he was convicted of a criminal driving offense. *Id.* Dicks was also under investigation by the FBI at the time. *Id.* Williamson appointed Dicks' father, Richard Dicks, to the position of "super chief." *Id.* Richard Dicks was also a subject of the FBI investigation. *Id.* Around the same time, Williamson appointed Sergeant Dave Forystek to the position of deputy chief of police. *Id.* ¶ 10.

A reporter for the *Flint Journal*, a local newspaper, allegedly contacted Hetherington on June 5, 2008, to ask his opinion about the new appointments. *Id.* ¶ 12. The *Journal* published a story that day containing Hetherington's statements. Pls.' Br. Ex. K at 2. In

---

[1] Pursuant to the a stipulation of the parties, the Court dismssed Gaspar from this action on March 26, 2009.

the article, the following statement was attributed to him: "Basically (the Flint Police Department is) a laughingstock and appointments like these don't add much more to it." *Id.* The article identified the speaker as "Sgt. Rick Hetherington, president of the sergeants' union." *Id.*

A *Journal* reporter also contacted Winch to ask his opinion about the new appointments. The *Journal* published a second article on June 5, 2008, stating:

> Lt. David Winch, president of the lieutenants' and captains' bargaining unit, said he is checking to see if their contract was violated when Forystek was promoted Monday.
>
> "We're checking into our options," Winch said, adding [that] filing a grievance could be a possibility.
>
> The contracts stipulate that anyone appointed to the deputy chief position has to come from within the ranks of captain or lieutenant. Forystek was a sergeant when he was promoted.

Pls.' Br. Ex. L at 1. Winch allegedly received a verbal warning a few days later, on June 11, 2008, for violating the policy banning media contact. Compl. ¶ 22.

On June 6, 2008, David Dicks ordered Lieutenant Terry Speedy to suspend Hetherington for two days without pay, effective June 7, 2008. Compl. Ex. 2. On June 9, 2008, Forystek created an incident report to be investigated by internal affairs, stating that Chief David Dicks directed him to leave an incident report following Hetherington's statements to the *Flint Journal*. Compl. Ex. 4. The incident report referred to Department Rules and Regulations No. 5/00 2.2.1, Responsibility for the Release of Information. *Id.*

Also on June 9, 2008, David Dicks distributed a Memorandum with the subject "Release of Information," stating:

> No member of the department shall speak to or release any information regarding the department and/or its employees to the news media. This is in accordance with the Flint Police Department's Rules and Regulations #5/002.2-1 - Responsibility for the Release of Information.

Compl. Ex. 1. Prior Department policy allowed officers to speak to the media, but required them to clarify that such statements reflected their own opinions, rather than the opinion or policy of the Department. Compl. Ex. 6.

Lieutenant Bethany Whaley of Internal Affairs investigated Forystek's incident report. On June 12, 2008, she issued an Investigative Report Synopsis, concluding that because the *Journal* article appeared before the updated "Release of Information" Memorandum, Hetherington had not violated Department policy. Compl. Ex. 7. She therefore recommended that any discipline against Hetherington should not be sustained. *Id.* David Dicks disagreed with these findings, and on June 12, 2008, issued Hetherington a two-day suspension. *Id.* Defendants claim that this suspension was later rescinded. Defs.' Br. Supp. Mot. 2.

In August 2008, Committee for a Better Flint, a citizens group, collected signatures for a mayoral recall campaign. Off-duty officer Dunell Chaney, among the volunteers, was allegedly "glared at" by Williamson and David Dicks as they drove by one of the group's activities. Pl.'s Br. 3. Chaney was allegedly transferred to a less favorable position two days later. *Id.* Hetherington also was a member of Committee for a Better Flint, and on August 12, 2008, he was contacted by a television reporter asking for comment on Chaney's transfer. Compl. ¶ 24. Hetherington stated that he was speaking as a member of Committee for a Better Flint, and said that he believed the transfer was an act

4

of intimidation that violated the First Amendment. *Id.* David Dicks requested that Officer Connie Johnson investigate the incident. Johnson issued an Investigative Report Synopsis on August 13, 2008, concluding that Hetherington had violated the Department's media policy by speaking on camera. Compl. Ex. 8. On August 21, 2008, Hetherington was notified by mail that his employment was terminated for violation of the June 9, 2008 Memorandum forbidding media contact. Compl. ¶ 26. The City later rescinded Hetherington's termination, in a letter dated August 23, 2008. Compl. Ex. 9.

Plaintiffs filed this action on August 27, 2008, asserting that the Department's media policy violated the First Amendment. Hetherington and Winch also claim that they were disciplined in violation of their rights under the First and Fourteenth Amendments. Plaintiffs seek a declaration that the media policy is unconstitutional, an injunction prohibiting its enforcement, and correction of Plaintiffs' personnel files to remove references to the allegedly unlawful discipline. Plaintiffs also seek compensatory and punitive damages, lost wages, costs, and attorney's fees.

Dicks issued a Memorandum on September 8, 2008, rescinding the June 9, 2008 Memorandum. On August 10, 2010, Defendants filed a Motion for Summary Judgment, arguing that Plaintiffs' action should be dismissed because (1) they suffered no adverse employment action, (2) their speech was not constitutionally protected, (3) their alleged injuries were not caused by a municipal custom or policy, and (4) any alleged deprivation of property interests was too minimal to trigger due process protections.

## II. Standard of Review

Summary judgment is appropriate when "there is no genuine dispute as to any

material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52, 106 S. Ct. 2505, 2512 (1986). After adequate time for discovery and upon motion, Rule 56 mandates summary judgment against a party who fails to establish the existence of an element essential to that party's case and on which that party bears the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986). The movant has an initial burden of showing "the absence of a genuine issue of material fact." *Id.* at 323, 106 S. Ct. at 2553.

Once the movant meets this burden, the non-movant must come forward with specific facts showing that there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986). To demonstrate a genuine issue, the non-movant must present sufficient evidence upon which a jury could reasonably find for the non-movant; a "scintilla of evidence" is insufficient. *Liberty Lobby*, 477 U.S. at 252, 106 S. Ct. at 2512. The court must accept as true the non-movant's evidence and draw "all justifiable inferences" in the non-movant's favor. *Id.* at 255, 106 S. Ct. at 2513. The inquiry is whether the evidence presented is such that a jury applying the relevant evidentiary standard could "reasonably find for either the plaintiff or the defendant." *Id.*, 106 S. Ct. at 2514.

### III. Plaintiffs' First Amendment Retaliation Claims

**A. Governing Law**

"While public employees may not be required to sacrifice their First Amendment free speech rights in order to obtain or continue their employment, a state is afforded greater leeway to control speech that threatens to undermine the state's ability to perform its legitimate functions." *Rodgers v. Banks*, 344 F.3d 587, 596 (6th Cir. 2003). Courts apply a three-step inquiry to public employees' First Amendment retaliation claims.

First, the Court must determine whether the speech addressed a matter of public concern. *Id.* (citing *Connick v. Myers*, 461 U.S. 138, 143, 103 S. Ct. 1684, 1688 (1983)). This is a question of law for the Court to resolve, although there may be some factual questions for a jury if it is disputed whether the expression occurred or what words were specifically stated. *Hughes v. Region VII Area Agency on Aging*, 542 F.3d 169, 180 (6th Cir. 2008). "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick*, 461 U.S. at 147-48, 103 S. Ct. at 1690. A public employee speaking pursuant to his official responsibilities is not speaking as a citizen, and his speech is therefore not constitutionally protected. *Garcetti v. Ceballos*, 547 U.S. 410, 421, 126 S. Ct. 1951, 1960 (2006).

If the speech addressed a matter of public concern, the Court must "balance the interests of the public employee, 'as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" *Rodgers*, 344 F.3d at 596 (quoting *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568, 88 S. Ct. 1731, 1734-35 (1968)). The application of the *Pickering* balancing test is a matter of law for the Court to decide.

*Hughes*, 542 F.3d at 181.

"Finally, the court must determine whether the employee's speech was a substantial or motivating factor in the employer's decision to take the adverse employment action against the employee." *Id*. "[T]he employee must 'point to specific, nonconclusory allegations reasonably linking her speech to employer discipline.'" *Rodgers*, 344 F.3d at 602 (quoting *Farmer*, 295 F.3d at 602). An adverse action is one that causes the plaintiff "to suffer an injury that would likely chill a person of ordinary firmness from continuing to engage in that [constitutionally protected] activity." *Farmer v. Cleveland Pub. Power*, 295 F.3d 593, 602 (6th Cir 2002) (alteration in original). As long as the alleged retaliatory actions are not "inconsequential," the question of whether such action would deter protected conduct is a question of fact for the jury to decide. *Bell v. Johnson*, 308 F.3d 594, 603 (6th Cir. 2002).

**B. Matter of Public Concern**

If some portion of a public employee's speech addresses a matter of public concern, it is protected. *Farhat v. Jopke*, 370 F.3d 580, 589 (6th Cir. 2004). A matter is of public concern where it is the subject of legitimate news interest, and of value to the general public. *City of San Diego v. Roe*, 543 U.S. 77, 83-84, 125 S. Ct. 521, 525-26 (2004). "When an institution oversees some aspect of public safety, the correct operation of that institution is a matter of public concern." *Hoover v. Radabaugh*, 307 F.3d 460, 466 (6th Cir. 2002). Matters of interest only to employees, such as personal vendettas, do not enjoy First Amendment protection. *McMurphy v. City of Flushing*, 802 F.2d 191, 197-98 (6th Cir. 1986).

Winch's statements do not involve a matter of public concern. In the *Journal* article published on June 5, 2008, Winch stated that he was checking to determine whether the lieutenants' and captains' bargaining agreement had been breached by Forystek's appointment to the position of deputy chief. Pls.' Br. Ex. L at 1. Plaintiffs argue that this violation of the collective bargaining agreement indicated that Forystek was unqualified, and thus, a threat to public safety. Pls.' Br. 12. Winch's comments, however, did not allude to any threat posed by Forystek's appointment, and the *Journal* article stated that his appointment was temporary. Such alleged violations of the Department's collective bargaining agreement are not matters of interest to the general public. The Court therefore grants summary judgment for Defendants as to Winch's First Amendment claims.

Hetherington's statements, however, involved a matter of public concern. His comments in the *Journal* on June 5, 2008 indicated that the recent appointees were unfit for their positions, as the Department was "[b]asically a laughingstock" because of their appointments. The context of this comment reinforces this interpretation, as the article stated that union officials found the new police chief's "criminal background" and "lack of command experience" troubling. Pls.' Br. Ex. K at 2. Because the competency of the Department's leadership impacts its operation, it is a matter of public concern. Hetherington's comments regarding Officer Chaney's transfer also involve a matter of public concern. Hetherington made his statement during a discussion about Mayor Williamson's efforts to dissuade participation in the mayoral recall campaign. His comment raises the issue of City officials using their power to stifle political speech. Given the context, form, and content of this statement, the Court is persuaded that it

9

pertains to a matter of public concern.

Defendants cite *McMurphy v. City of Flushing*, but this decision provides little support for their argument. In that case, the plaintiff accused city officials of unspecified cover-ups and misconduct, used "strong and vulgar language," and even attempted to incite a physical altercation with the city manager. *McMurphy*, 802 F.2d at 193. The court found that the plaintiff's remarks and actions indicated a personal vendetta. Plaintiffs' comments here certainly paint a negative picture of Defendants' decisions, but fail to demonstrate the same sort of personal animosity.

Defendants point to *Brown v. City of Trenton*, but this comparison is inappropriate. In *Brown*, the plaintiff police officers wrote in a letter to the police chief that they were "fed up with . . . the internal strife from within our own department," citing a number of factors contributing to that strife. 867 F.2d 318, 319 (6th Cir. 1989). These included jealousy, internal politics, and allegations that the city's Emergency Response Tactical Team had become a scapegoat for the financial and union problems. *Id.* at 319-20. As the letter admittedly focused on "internal strife," it could only be construed as focusing on issues of personal interest to city employees.

**C. Statements Made Pursuant to an Employee's Official Duties**

In *Garcetti v. Ceballos*, the Supreme Court was faced with the question of whether a public employee could be disciplined for statements made in his official capacity. 547 U.S. at 414-15, 126 S. Ct. at 1955-56. The Court held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications

from employer discipline." *Id.* at 421, 126 S. Ct. at 1960. The Court noted that this result comported with the policies underlying First Amendment jurisprudence:

> Employers have heightened interests in controlling speech made by an employee in his or her professional capacity. Official communications have official consequences, creating a need for substantive consistency and clarity. Supervisors must ensure that their employees' official communications are accurate, demonstrate sound judgment, and promote the employer's mission.

*Id.* at 422-23, 126 S. Ct. at 1960. The Court noted that there was no dispute as to whether the employee made his statements pursuant to his official duties. *Id.* at 424-25, 126 S. Ct. at 1961. The Court therefore did not "articulate a comprehensive framework for defining the scope of an employee's duties in cases where there is room for serious debate." *Id.* *Garcetti* merely cautioned that when addressing such scenarios, "[t]he proper inquiry is a practical one." *Id.*

Courts applying this "practical" inquiry after *Garcetti* have faced the more difficult question of whether the First Amendment protects statements by public employees acting pursuant to their duties as union officials. The Seventh Circuit addressed this issue in *Fuerst v. Clarke*, 454 F.3d 770 (7th Cir. 2006). In *Fuerst*, the plaintiff deputy sheriff was also president of the union of Milwaukee County deputy sheriffs. *Id.* at 771. He criticized the sheriff's decision to replace a deputy with a civilian in a civil service position. *Id.* at 772. After this criticism was reported in Milwaukee's leading newspaper, the plaintiff was passed over for a promotion because he was not "loyal" to the sheriff's "vision." *Id.* The court found *Garcetti* inapplicable because of the plaintiff's dual roles:

> Because Fuerst's comments that precipitated the adverse action taken against him were made in his capacity as a union representative, rather than

11

> in the course of his employment as a deputy sheriff - his duties as deputy sheriff did not include commenting on the sheriff's decision to hire a public-relations officer - the Supreme Court's recent decision in *Garcetti v. Ceballos* is inapposite.

*Id.* at 774 (citation omitted). The court concluded that when the employee was "wearing his union president's hat, he is not challenging the sheriff's authority but carrying out duties consistent with that authority." *Id.* at 775.

The Sixth Circuit recently addressed this scenario in an unpublished opinion, *Miller v. City of Canton*, 319 Fed. Appx. 411 (6th Cir. 2009). In that case, the plaintiff police officer also served as president of the local police officers' union, the Canton Police Patrolman's Association. *Id.* at 412-13. The plaintiff and the union issued a press release alleging that the police chief discriminated against black police officers, citing various department practices in support of their claim. *Id.* at 413. The plaintiff was suspended for sixty days for preparing and issuing this press release. *Id.* He filed suit, alleging that the city retaliated against him for participation in a protected activity. The district court granted summary judgment for the employer, and the plaintiff appealed. On review, the Sixth Circuit panel briefly addressed the application of *Garcetti* to the case, concluding that the plaintiff "was not doing what he was 'employed to do' when he issued the press release . . . [r]ather, the press release fell outside [Plaintiff's] official duties as a police officer." *Id.* at 417 (citations omitted). Drawing this distinction between a union official's duties to his employer and his duties to the union, the panel reversed the district court's grant of summary judgment as to the plaintiff's First Amendment claim. *Id.* at 419.

Neither *Miller* nor *Fuerst* is binding precedent, but the reasoning of these decisions is

persuasive. The Court concludes that the City's interest in "controlling speech" and ensuring "substantive consistency," *see Garcetti*, 547 U.S. at 422-23, 126 S. Ct. at 1960, is considerably reduced in connection with the speech of a union official, due to the inherent tension between the union and the administration. The collective bargaining system envisions a dynamic between employer and union than is unlike the relationship between employer and employee; this includes the expression of sometimes conflicting opinions. An employer cannot expect to control the union's speech in the same way it would control an employee's. Hetherington spoke in his capacity as a union president, and therefore, *Garcetti* does not bar his First Amendment claims.

**D. *Pickering* Balancing**

If a public employee's speech addressed a matter of public concern, the Court must "balance the interests of the public employee, 'as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" *Rodgers*, 344 F.3d at 596 (quoting *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568, 88 S. Ct. 1731, 1734-35 (1968)). In weighing these interests, the Court should consider whether an employee's comments meaningfully interfere with the performance of his duties, undermine a legitimate goal or mission of the employer, create disharmony among co-workers, impair discipline by superiors, or destroy the relationship of loyalty and trust required of confidential employees." *Rodgers*, 344 F.3d at 601. "Relevant factors in this regard include 'the manner, time, and place of the employee's expression,' as well as 'the context in which the dispute arose.'" *Id.* (quoting *Rankin v. McPherson*, 483 U.S. 378, 388, 107 S. Ct. 2891,

2899 (1987)). Defendant bears the burden of demonstrating that legitimate grounds existed for the adverse action. *Id.*

Considering these factors, the Court concludes that the *Pickering* balancing weighs in Hetherington's favor. Defendants have presented no evidence indicating that his comments interfered with the performance of his duties. Defendants have also failed to demonstrate that his speech resulted in disharmony among his coworkers. There is no evidence that Hetherington's speech undermined the Flint Police Department's legitimate goals. The Court concludes that the union's interest in raising concerns about the leadership and operation of the Flint Police Department is greater than Defendants' general interest in maintaining police discipline.

Defendants cite case law holding that a city's interest in maintaining a disciplined police force outweighs officers' free speech interests, pointing to *Brown v. City of Trenton* in support of its position. This reliance is misplaced, as the *Brown* court concluded that the plaintiffs' speech did not involve a matter of public concern, making the balancing of interests unnecessary. *Brown*, 867 F.2d at 322. Defendants also cite *Graham v. City of Mentor*, an unpublished Sixth Circuit decision, but the case is distinguishable. In *Graham*, three plaintiff police officers used the media to repeatedly voice their disapproval of the police chief. 118 Fed. Appx. 27, 28 (6th Cir. 2004). They allegedly conducted interviews with the press, harassed a local bar owner to support the police union, and forced a security guard to send a letter critical of the police chief to the newspaper. *Id.* at 29. The district court granted the employer summary judgment, and the Sixth Circuit affirmed, holding that "a police chief cannot be expected to 'tolerate action which he reasonably

believed would disrupt the office, undermine his authority, and destroy close working relationships.'" *Id.* at 30 (quoting *Connick*, 461 U.S. at 154, 103 S. Ct. at 1694). The court found that the plaintiffs "clearly intended to create division among the officers," noting that "[a] police chief needs authority over and loyalty from his subordinates." *Id.* at 30-31. There is no indication, however, that Defendants exercise authority over Hetherington when he speaks as union president. His statements as union president do not undermine the authority of the police chief. The union's views may conflict with Defendants', but this does not constitute insubordination. Defendants note that the officers in *Graham* were "active in the police union," but there is no indication that they were authorized to speak or act on the union's behalf. This difference cannot be ignored, as it is undisputed that Hetherington was authorized to speak on the union's behalf.

**E. Adverse Action**

Defendants assert that a short-lived termination cannot support a First Amendment retaliation claim. The Court disagrees. "[E]ven minor forms of retaliation can support a First Amendment claim, for they may have just as much of a chilling effect on speech as more drastic measures." *Farmer*, 295 F.3d at 602 (quoting *Smith v. Fruin*, 28 F.3d 646, 649 n.3 (7th Cir. 1994)). A jury could conclude that termination from employment would chill an employee's speech. Although Hetherington's termination of August 21, 2008 was rescinded on August 23, 2008, Defendants had not yet rescinded the media policy under which he was disciplined; the policy was rescinded on September 8, 2008. Thus, even after the termination was rescinded, it was possible that Hetherington could be disciplined again under the same policy. Drawing all justifiable inferences in Hetherington's favor,

the Court concludes that he has established at least a genuine dispute of material fact regarding whether such discipline would chill a person of ordinary firmness. Accordingly, the Court cannot grant summary judgment for Defendants.

Defendants cite discrimination cases holding that temporary employment actions cannot be considered adverse, but such cases apply a different legal standard. A plaintiff alleging employment discrimination under Title VII must show a change in "his compensation, terms, conditions, or privileges of employment." 42 U.S.C. § 2000e-2(a)(1); *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 62, 126 S. Ct. 2405, 2411 (2006). The First Amendment imposes no such requirement, and the Court is unaware of any Sixth Circuit authority providing that the Title VII requirement governs First Amendment claims.

Defendants cite *Harris v. Detroit Public Schools*, 245 Fed. Appx. 437 (6th Cir. 2007), for the proposition that a loss of wages is required to support a retaliation claim. In the passage cited by Defendants, however, the court only held that "a suspension with pay and full benefits pending a timely investigation into suspected wrongdoing is not an adverse employment action." *Id.* at 443-44 (quoting *Peltier v. United States*, 388 F.3d 984, 988 (6th Cir. 2004)). *Harris* does not preclude retaliation claims absent lost wages. While a paid suspension pending an investigation may not be actionable, the City did not indicate that Hetherington's termination was merely temporary.

### IV. Plaintiffs' Due Process Claims

Plaintiffs argue that their due process rights were violated because they were punished retroactively under the media policy stated in David Dicks' June 9, 2008

16

Memorandum. The Fourteenth Amendment protects against the deprivation of life, liberty or property without due process of law. U.S. Const. amend. XIV, § 1. The requirements of due process are implicated only if there has been a deprivation of an interest "encompassed by the Fourteenth Amendment's protection of liberty and property." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 569, 92 S. Ct. 2701, 2705 (1972). Due process protection does not extend to *de minimis* property interests. *Kennedy v. City of Cincinnati*, 595 F.3d 327, 335 (6th Cir. 2010).

According to Defendants, the June 9, 2008 Memorandum was a mere continuation of the Department's existing media policy. Defs.' Br. Supp. Mot. 18. Plaintiffs, however, have provided testimony stating that there was a difference between the two policies. Pls.' Br. Ex. CC at 25. Prior Department policy permitted employees to make statements to the media if they clarified that the statements did not reflect the opinions or policy of the Department. Pls.' Br. Ex. P. The June 9, 2008 Memorandum prohibited all statements to the media. Pls.' Br. Ex. M. The Court finds that Plaintiffs have established at least a genuine dispute of material fact regarding whether the Department implemented and disciplined Plaintiffs under a new policy.

Hetherington has alleged a deprivation that is cognizable in a due process claim. Defendants cite *Carter v. W. Reserve Psychiatric Rehab.*, 767 F.2d 270, 272 (6th Cir. 1985) (per curiam), for the proposition that a two-day suspension constitutes a *de minimis* deprivation of property.[2] *Carter*'s holding was subsequently questioned in *Boals v. Gray*,

---

[2] Defendants also point to *Gillard v. Norris*, 857 F.2d 1095, 1098 (6th Cir. 1988), following *Carter*.

775 F.2d 686, 689 n.5 (6th Cir. 1985).  In *Boals*, the plaintiff asserted both procedural due process and First Amendment claims.  The court, in reviewing the plaintiff's due process claim, noted that "the first amendment claim raises considerations such as the potential chilling effect of plaintiff's suspension on himself and others that weigh against classification of his suspension as *de minimis*."  *Id.*

Winch has not alleged deprivation of a property interest protected by the Fourteenth Amendment.  He claims that he received a verbal warning after his statements to the media.  Although Winch, like Hetherington, raises First Amendment claims implicating the chilling effect of his discipline, the Court concludes that Winch's verbal warning represents a minor deprivation that cannot support a due process claim.  "[T]he range of interests protected by procedural due process is not infinite."  *Roth*, 408 U.S. at 570, 92 S. Ct. at 2705.  Accordingly, Defendants must be granted summary judgment as to Winch's due process claim.

## V. Official Policy or Custom

Defendants argue that Plaintiffs' alleged injuries were not caused by a municipal custom or policy, noting that municipalities cannot be held liable under a theory of *respondeat superior* for the torts of their employees.  Municipal liability attaches when the action that inflicts the injury represents official policy.  *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694, 98 S. Ct. 2018, 2037-38 (1978).  Where an individual seeks to hold a municipality liable for a constitutional violation, "[a] court's task is to 'identify those officials or governmental bodies who speak with final policymaking authority for the local governmental actor concerning the action alleged to have caused the particular

18

constitutional or statutory violation at issue.'" *McMillian v. Monroe Cnty.*, 520 U.S. 781, 784-85, 117 S. Ct. 1734, 1736 (1997). "Officials can derive their authority to make final policy from customs or legislative enactments, or such authority can be delegated to them by other officials who have final policymaking authority." *Feliciano v. City of Cleveland*, 988 F.2d 649, 655 (6th Cir. 1993). The Court must identify the officials who have the power to make policy on a particular issue; the inquiry is not an "all or nothing" matter. *Id.* at 785, 117 S. Ct. at 1737.

Plaintiffs argue that the media policy unconstitutionally prohibited police officers from speaking about matters of public concern. Compl. ¶ 38. Plaintiffs have set forth evidence demonstrating that this policy originated from an official with final policymaking authority. Acting police chief David Dicks issued the media policy in a Memorandum dated June 9, 2008. Pls.' Br. Ex. M. Plaintiffs presented testimony stating that department heads held ultimate authority for setting policy within their departments. Pls.' Br. Ex. CC at 47. Plaintiffs have also presented evidence showing that Mayor Donald Williamson directed Dicks to issue the policy, and that this was accepted practice within the City's administration. Pls.' Br. Ex. CC at 46-47. With respect to disciplinary decisions, Dicks testified that he followed Williamson's orders. Pls.' Br. Ex. I at 110. Drawing all justifiable inferences in Plaintiffs' favor, the Court concludes that they have established a genuine dispute of material fact regarding whether officials with final policymaking authority took the actions in question.

## VI. Conclusion

Defendants must be granted summary judgment as to Winch's claims. Winch's First

Amendment claims fail as a matter of law, as his alleged speech did not involve a matter of public interest, and was therefore not constitutionally protected. His due process claim fails because the alleged property interest is properly considered *de minimis*. Summary judgment must be denied as to Hetherington's claims.

Accordingly,

**IT IS ORDERED** that Defendants' Motion for Summary Judgment is **GRANTED** with respect to Plaintiff David Winch's claims under Counts II and III of the Complaint (Violation of First Amendment Rights and Violation of Due Process Rights);

**IT IS FURTHER ORDERED** that Defendants' Motion for Summary Judgment is **DENIED** in all other respects.

                                        s/PATRICK J. DUGGAN
                                        UNITED STATES DISTRICT JUDGE

Copies to:
Michael J. Steinberg, Esq.
Jessie J. Rossman, Esq.
Gregory T. Gibbs, Esq.
Muna A. Jondy, Esq.
Sarah C. Zearfoss, Esq.
Thomas L. Kent, Esq.
John A. Postulka, Esq.